# IN THE SUPREME COURT, STATE OF WYOMING

## 2020 WY 8

### OCTOBER TERM, A.D. 2019

### January 17, 2020

EXARO ENERGY III, LLC,

Appellant
(Petitioner),

v.

WYOMING OIL AND GAS
CONSERVATION COMMISSION and
JONAH ENERGY, LLC,

Appellees
(Respondents).

S-19-0116

*W.R.A.P. 12.09(b) Certification*
*From the District Court of Natrona County*
*The Honorable Daniel L. Forgey, Judge*

*Representing Appellant:*
Jamie L. Jost, Jost Energy Law, P.C., Denver, Colorado.

*Representing Appellee Jonah Energy LLC:*
S. Thomas Throne, Jacob T. Haseman and Alexis A. Klatt, Throne Law Office, P.C., Sheridan, Wyoming. Argument by Mr. Throne.

*Representing Appellee Wyoming Oil and Gas Commission:*
No appearance.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.

**KAUTZ, Justice.**

[¶1]     Exaro Energy III, LLC (Exaro) filed two applications with the Wyoming Oil and Gas Conservation Commission (Commission) seeking the approval of adjacent drilling and spacing units (DSUs or units) in the Jonah Field.  Jonah Energy, LLC (Jonah) opposed the applications.  The Commission consolidated the applications and held a contested case hearing.  Exaro and Jonah agreed that the evidence presented at the hearing would apply to both applications.  At the conclusion of the hearing, the Commission found and concluded as to both applications that Exaro had met its burden of proof and had provided actual, empirical data satisfying the statutory requirements for the establishment of a DSU.  Nevertheless, the Commission approved one application (Docket No. 1902-2018) but not the other (Docket No. 1903-2018).  The Commission's stated reason for denying the application in Docket No. 1903-2018 was that it believed "additional data from horizontal development in the Jonah Field should be analyzed prior to approving the Application to establish a drilling and spacing unit on the Subject Lands."

[¶2]     Exaro filed a petition for review of administrative action with the district court challenging the Commission's denial of its application in Docket No. 1903-2018.  It also requested that the district court certify this matter to this Court pursuant to Rule 12.09 of the Wyoming Rules of Appellate Procedure.  The district court granted Exaro's request for certification and we accepted the certified case.  We conclude the Commission's denial of Exaro's application in Docket No. 1903-2018 was arbitrary and capricious.  We reverse.

**ISSUE**

[¶3]     Exaro raises three issues which we restate as one:

> Was the Commission's denial of Exaro's application to establish a DSU in Docket No. 1903-2018 arbitrary and capricious given it found and concluded that Exaro had met its burden of proof and the applicable legal standard, provided actual, empirical data supporting the statutory requirements for the establishment of a DSU, and granted Exaro's application in Docket No. 1902-2018 based on the same evidence?

**FACTS**

[¶4]     Exaro and Jonah both own working interests in the Jonah Field.[1]  On April 18, 2018, Exaro filed applications with the Commission seeking to establish two adjacent "stand-up"

---

[1] Jonah emphasized at the contested case hearing and notes in its appellate brief that its working interests in the subject lands are greater than Exaro's.  Wyoming law does not prohibit minority interest owners from seeking the establishment of a DSU.  Wyo. Stat. Ann. §§ 30-5-104(d)(iv), 30-5-109(a) (LexisNexis 2019); *see also Union Pac. Res. Co. v. Texaco, Inc.*, 882 P.2d 212, 226 (Wyo. 1994) ("Except for the due process

1

DSUs[2] for the production of hydrocarbons from the Lance Pool in the Jonah Field. The application in Docket No. 1902-2018 (hereinafter 1902) sought a 1,285.19-acre unit for Sections 26 and 35, Township 29 North, Range 108 West, 6th P.M., Sublette County. The application in Docket No. 1903-2018 (hereinafter 1903) sought a 1,038.65-acre unit for Section 25 and the N½, N½ SW¼ of Section 36, Township 29 North, Range 108 West, 6th P.M., Sublette County. The applications requested that one horizontal well be drilled within each unit to the Lance Pool. In separate proceedings before the Commission, Exaro filed an application for a permit to drill (APD) an initial horizontal well in each unit. The initial well would be drilled in the northwest corner of each unit and proceed south for approximately two miles along the unit's western border. Visuals of Exaro's requested DSUs and the proposed locations of its initial wells are helpful and are attached as Appendix A (1902) and Appendix B (1903).

[¶5] Jonah protested Exaro's applications because a north-south oriented horizontal well had yet to be drilled in the Jonah Field. The only horizontal wells present in the Jonah Field were oriented east-west. According to Jonah, if the initial wells proposed to be drilled by Exaro proved infeasible, the remainder of the units would have to be developed with extremely short east-west laterals, which would cause waste of hydrocarbons, harm correlative rights, and increase costs and surface disturbances. Jonah filed its own application with the Commission for the approval of a single DSU covering the lands underlying both 1902 and 1903. It withdrew that application prior to the Commission's decisions on Exaro's applications.

[¶6] The Commission consolidated Exaro's applications for purposes of the contested case hearing. It also ordered that the evidence presented at the hearing would apply to both applications. The parties agreed the only issue before the Commission was whether the lands underlying Exaro's applications should be developed with north-south or east-west oriented horizontal wells.[3]

[¶7] With respect to that issue, Exaro presented geological and engineering testimony explaining that due to the presence of major faults running north-south within the proposed units, the only appropriate way to access the gas stranded under the subject lands and avoid crossing the faults is to run the wells parallel to those faults, i.e., in a north-south direction.

---

rights accorded 'interested parties,' the establishment of a drilling unit occurs without regard to ownership interests." (citing § 30-5-109(a)).

[2] A "stand-up" unit's north-south boundaries are longer than its east-west boundaries. In contrast, a "laydown" unit's east-west boundaries are longer than its north-south boundaries.

[3] Exaro emphasized at the contested case hearing that its APDs were not before the Commission. Yet, it agreed the only issue before the Commission was whether the subject lands should be developed with north-south or east-west horizontal wells. These somewhat inconsistent positions can be explained based on the shape of Exaro's proposed units as "stand-up" units. Because a "stand-up" unit's north-south boundaries are longer than its east-west boundaries, *see supra* n.2, such units support north-south development. As a result, although the Commission's order did not specifically approve a north-south oriented horizontal well in each unit, it implicitly did so by approving a "stand-up" DSU.

Jonah's witnesses did not object to the drilling of a north-south horizontal well along the western border in 1902. They agreed data from a north-south oriented horizontal well would be helpful. They did object, however, to the drilling of a north-south oriented well along the western boundary in 1903. According to them, if the initial well in both units proved unworkable, the remainder of the subject lands would have to be developed with short east-west laterals (under a mile long) because the well in 1903 would block the drilling of longer east-west laterals. Jonah's engineering witness testified short laterals cause waste of hydrocarbons because they recover less gas per dollar spent, have to be shut-in sooner than longer laterals, and ultimately leave more gas stranded due to required setbacks; they also create "substantially more surface disturbance" due to the need for additional wells, drilling pads, and production-related facilities.

[¶8]    At the conclusion of the hearing, the Commission decided <u>as to both 1902 and 1903</u> that Exaro had (1) "met its burden of proof," (2) "satisfied the applicable legal standard[,]" and (3) "provided . . . actual, empirical data that [each DSU] . . . is not smaller than the maximum area that can be effectively drained by one (1) horizontal well drilled to the Lance Pool on the Subject Lands and that [each] unit will permit the recovery of hydrocarbons in the Lance Pool underlying the Subject Lands, will prevent waste and will protect correlative rights."[4]    Nevertheless, the Commission approved only 1902. A majority of the Commission denied 1903 stating "additional data from horizontal development in the Jonah Field should be analyzed prior to approving the Application to establish a drilling and spacing unit on the Subject Lands." Exaro appeals from the Commission's denial of its application in 1903.

**STANDARD OF REVIEW**

[¶9]    When an agency's decision is certified to this Court under W.R.A.P. 12.09, "we apply the standards for judicial review set forth in Wyo. Stat. Ann. § 16-3-114(c) [of the Wyoming Administrative Procedures Act]."[5]    *Wyodak Res. Dev. Corp. v. Wyo. Dep't of Revenue*, 2017 WY 6, ¶ 14, 387 P.3d 725, 729 (Wyo. 2017). Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2019) provides in relevant part:

---

[4] The Commission concluded Exaro had provided "*substantial evidence* and actual, empirical data that [each DSU] . . . is not smaller than the maximum area that can be effectively drained by one (1) horizontal well drilled to the Lance Pool on the Subject Lands and that [each] unit will permit the recovery of hydrocarbons in the Lance Pool underlying the Subject Lands, will prevent waste and will protect correlative rights." (Emphasis added). As we will explain, the "substantial evidence" standard is the standard used during judicial review of agency decisions; it does not apply in contested case proceedings. *JM v. Dep't of Family Servs.,* 922 P.2d 219, 223 (Wyo. 1996) (citing § 16-3-114(c)(ii)(E) and *Latimer v. Rissler & McMurry Co.*, 902 P.2d 706, 708 (Wyo. 1995)). "The normal standard of proof in administrative hearings is the preponderance-of-the-evidence standard" but "[i]n certain circumstances, such as in professional disciplinary hearings, the clear-and-convincing-evidence standard applies." *Id.* (citations omitted).

[5] The Commission is an agency under the Wyoming Administrative Procedures Act. Wyo. Stat. Ann. § 16-3-101(b)(i) (LexisNexis 2019).

3

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

. . .

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law [or]

. . .

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶10]   When, as here, both parties submitted evidence at the contested case hearing and an agency's factual findings are involved, we apply the substantial evidence standard of review.  *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 10, 188 P.3d 554, 558 (Wyo. 2008) (quoting *Newman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2002 WY 91, ¶¶ 22-23, 49 P.3d 163, 171-72 (Wyo. 2002)).  *See also, Camacho v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2019 WY 92, ¶ 23, 448 P.3d 834, 843 (Wyo. 2019).  Under this standard of review,

"we examine the entire record to determine whether there is substantial evidence to support an agency's [factual] findings. If the agency's decision is supported by substantial evidence, we cannot properly substitute our judgment for that of the agency and must uphold the findings on appeal.  Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions.  It is more than a scintilla of evidence."

*Dale*, ¶ 11, 188 P.3d at 558 (quoting *Newman*, ¶ 12, 49 P.3d at 168).  Because the agency "'is the trier of fact and has the duty to weigh the evidence and determine the credibility of witnesses,'" we give deference to its factual findings unless they are "'clearly contrary to the overwhelming weight of the evidence on record.'"  *Id.* (quoting *Newman*, ¶ 26, 49 P.3d at 173).  This is especially true for "[t]echnical decisions relative to the waste of oil and gas resources."  *Moncrief v. Wyo. Oil & Gas Conservation Comm'n*, 981 P.2d 913, 916

(Wyo. 1999) (citations omitted). Such decisions are for the Commission to make as "experts in the field." *Id.* (citations omitted).

[¶11] "Even if an agency record contains sufficient evidence to support the administrative decision under the substantial evidence test, this Court applies the arbitrary-and-capricious standard as a 'safety net' to catch other agency action that may have violated the Wyoming Administrative Procedures Act." *Rodgers v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2006 WY 65, ¶ 19, 135 P.3d 568, 575 (Wyo. 2006) (citations omitted). "Under the umbrella of arbitrary and capricious actions would fall potential mistakes such as inconsistent or incomplete findings of fact or any violation of due process." *Id.*, ¶ 19, 135 P.3d at 575 (quoting *Decker v. State ex rel. Wyo. Med. Comm'n*, 2005 WY 160, ¶ 24, 124 P.3d 686, 694 (Wyo. 2005)).

> The arbitrary and capricious test requires the reviewing court to review the entire record to determine whether the agency reasonably could have made its finding and order based upon all the evidence before it. The arbitrary and capricious standard is more lenient and deferential to the agency than the substantial evidence standard because it requires only that there be a rational basis for the agency's decision.

*Tayback v. Teton Cnty. Bd. of Cnty. Comm'rs*, 2017 WY 114, ¶ 13, 402 P.3d 984, 988 (Wyo. 2017) (citations and quotations omitted).

## DISCUSSION

[¶12] Exaro argues, *inter alia*, the Commission's decision to deny 1903 was arbitrary and capricious given the Commission's findings and conclusions that Exaro had met its burden of proof and the applicable legal standard and provided actual, empirical evidence satisfying the statutory requirements and given its approval of 1902 based on the very same evidence. We agree.

[¶13] In 1951, the Wyoming legislature passed the Oil and Gas Conservation Act (Act) "to regulate the oil and gas industry in the state." *Union Pac. Res. Co. v. Texaco, Inc.*, 882 P.2d 212, 222 (Wyo. 1994) (citing Mark W. Gifford, *The Law of Oil And Gas In Wyoming: An Overview*, XVII Land & Water L.Rev. 401, 415 (1982)). The purpose of the Act is to "prevent[] the waste of Wyoming's oil and gas resources and protect[] the correlative rights of owners." *Id.* at 223 (citing §§ 30-5-102 and 30-5-109). The Act established the Commission, giving it the "jurisdiction and authority over all persons and property, public and private, necessary to effectuate the purposes and intent of this act . . . ." Section 30-5-104(a); *see also Union Pac. Res.*, 882 P.2d at 222-23; *Moncrief*, 981 P.2d at 916. Included within the Commission's authority is its "broad authority" to establish DSUs. *Union Pac.*

5

*Res.*, 882 P.2d at 224. *See also, Anschutz Corp. v. Wyo. Oil & Gas Conservation Comm'n*, 923 P.2d 751, 755 (Wyo. 1996).

[¶14]   Section 30-5-104(d)(iv) gives the Commission the authority

> [w]hen required, in order to protect correlative rights, to establish drilling units affording each owner an opportunity to drill for and produce as a prudent operator, and so far as it is reasonably practicable to do so without waste, his just and equitable share of the oil or gas or both in the pool . . . upon such terms and conditions as the commission may determine, upon the commission's own motion or upon application of any interested person and after notice and hearing as provided by chapter 6, Wyoming Statutes 1957 [§§ 30-5-101 through 30-5-204], as amended, and by the commission's rules[.]

*See also,* § 30-5-109(a) ("When required, to protect correlative rights or, to prevent or to assist in preventing any of the various types of waste of oil or gas prohibited by this act, or by any statute of this state, the commission, upon its own motion or on a proper application of an interested party, but after notice and hearing as herein provided shall have the power to establish drilling units of specified and approximately uniform size covering any pool.").[6]   Relevant here, the Act defines waste as including "[t]he locating, drilling, equipping, operating, or producing of any oil or gas well in a manner that causes, or tends to cause, reduction in the quantity of oil or gas ultimately recoverable from a pool under prudent and proper operations, or that causes or tends to cause unnecessary or excessive surface loss or destruction of oil or gas."  Section 30-5-101(a)(i)(D).  "'Correlative rights' . . . mean the opportunity afforded the owner of each property in a pool to produce, so far as it is reasonably practicable to do so without waste, his just and equitable share of the oil or gas, or both, in the pool."  Section 30-5-101(a)(ix).  The Commission is required to determine from the evidence presented at the hearing the acreage encompassing the unit and its shape; the unit "shall not be smaller than the maximum area that can be efficiently drained by one (1) well."  Section § 30-5-109(b).

[¶15]   In sum, "before a drilling unit can be established, the Commission must first find that such a unit is necessary to protect correlative rights or to prevent waste.  After this initial determination is reached, the Commission must also determine the acreage to be embraced within each unit and the shape thereof based on evidence adduced at the hearing but each unit shall not be smaller than the maximum area that can be efficiently drained by

---

[6] Although the statutes refer to drilling units, the Commission uses the terms "spacing unit," "drilling unit" and "drilling and spacing unit" interchangeably.  *See* Wyoming Oil and Gas Conservation Commission Rules, Chapter 1, Section 2 (ww).

one well." *Larsen v. Oil & Gas Conservation Comm'n*, 569 P.2d 87, 90 (Wyo. 1977) (footnotes and quotations omitted).

[¶16]  In this case, the Commission found and concluded Exaro met its burden of proof, satisfied the applicable legal standard and provided actual, empirical data that the 1,038.45-acre unit requested in 1903 was not smaller than the maximum area that can be effectively drained by one horizontal well drilled to the Lance Pool on the subject land and that one north-south oriented horizontal well drilled to the Lance Pool on the Subject Lands will prevent waste and protect correlative rights.  These findings and conclusions are supported by substantial evidence.

[¶17]  Exaro's expert geologist testified the Lance Pool is present and continuous below the subject lands and below the reach of the vertical wells already present.  He testified the proposed unit is of a typical size approved in the Jonah Field and the geological stress orientation underlying the subject lands supports north-south oriented horizontal wells.  He also stated that due to the presence of major faults running north-south in the unit, the only appropriate way to access the stranded hydrocarbons and avoid crossing those faults is to run the horizontal wells parallel to the faults, i.e., in a north-south direction.

[¶18]  Exaro's engineering expert opined Exaro's proposal to drill north-south oriented horizontal wells was reasonable considering it was attempting to maximize lateral length while minimizing the risk of drilling across major faults.  He told the Commission this proposal is consistent with a previous application submitted by Jonah seeking the Commission's approval of an unconventional DSU and a horizontal well that would run parallel to interior faults in order to avoid crossing them.  He testified there was sufficient oil and gas in place (OGIP) present within the two proposed DSUs to allow for existing and authorized-but-yet-to-be drilled vertical wells and at least one horizontal well in each unit while protecting correlative rights and preventing waste.  He told the Commission that without horizontal well development there will be approximately 183 billion cubic feet equivalent (BCFE) of stranded hydrocarbons.  He also opined, consistent with Exaro's geologist, that the projected geological stress orientation is "diagonal for both north-south and east-west lateral well trajectories such that it would allow for fracture stimulations of wells oriented in either of those types of directions" so "there's not a substantial difference between north-south or an east-west orientation with respect to being able to stimulate wells."  He calculated one horizontal well in 1903 will drain an average of 86 acres, which is less than the size of the requested unit.

[¶19]  Jonah did not seriously contest this evidence at the hearing and does not do so on appeal.  Indeed, it did not appeal from the Commission's approval of Exaro's application in 1902, which was based on the same evidence.  Instead, as it did at the hearing, Jonah devotes much of its brief advocating for its own proposed development of the subject lands—a larger DSU covering both of Exaro's proposed units—which, it claims, provides for greater optionality and flexibility for the development of the resources on the subject

7

lands compared to Exaro's proposal. That application, however, was not before the Commission because Jonah voluntarily withdrew it prior to the Commission's decision. It is not before us.[7]

[¶20] Jonah also argues the Commission denied 1903 because there was insufficient geological and engineering data to support north-south development in the Jonah Field and the Commission desired not to lock in north-south development should such development prove infeasible. That decision, Jonah tells us, was based on substantial evidence from both sides that there was insufficient data concerning a north-south oriented horizontal well because such well had yet to be drilled in the Jonah Field. It also points to the testimony of its geologist and engineer, both of whom opined if Exaro's wells in 1902 and 1903 proved unworkable, the remainder of the land would have to be developed with short east-west laterals due to the location of the 1903 well, which will create waste. According to Jonah, this explains why the Commission approved 1902 but denied 1903 even though they were based on the same evidence.

[¶21] The problem for Jonah is that neither the lack of data concerning north-south development nor the need to allow for optionality in order to prevent waste were reasons the Commission gave for denying 1903. The Commission denied 1903 because it wanted additional data from horizontal development (presumably from the well on 1902) prior to approving 1903. However, the evidence presented at the hearing applied equally to both 1902 and 1903. If there was insufficient data supporting north-south development in 1903, that same problem would have applied to 1902, yet the Commission approved 1902. Moreover, while Jonah's witnesses testified both of Exaro's proposed units may cause waste if the north-south wells proved infeasible, the Commission explicitly found and concluded that the establishment of the unit in 1903 will prevent waste. As we have already discussed, that finding and conclusion was based on substantial evidence.

[¶22] Jonah also argues the Commission was not required to establish the unit in 1903 even though the Commission found and concluded Exaro had met its burden of proof and met the statutory requirements for the establishment of that unit. It contends that while the Act gives the Commission the authority to establish a DSU under these circumstances, it is not required to do so. It is unnecessary for us to consider the extent of the Commission's discretion to deny an application for a DSU even when the statutory requirements for creation of a DSU have been proven, because any discretion the Commission may have is "constrained . . . by fundamental rules of administrative law." *Larsen*, 569 P.2d at 90. Those rules include that its decision not be arbitrary and capricious.

---

[7] In any event, Jonah's proposed DSU was not without problems. Jonah claimed that with the approval of its proposed larger unit, a north-south oriented well could be drilled along the unit's western border and if the well proved infeasible, the remainder of the unit could still be developed with longer east-west laterals. Jonah's geologist admitted such east-west laterals would cross a minor fault located in the center of its proposed unit but claimed a well can be drilled through a minor fault without "a problem." Exaro's geologist, however, testified the fault was not a minor fault but rather a major fault carrying significant risk.

8

[¶23]   Agency action is arbitrary and capricious if it lacks a "rational basis." *See Tayback*, ¶ 13, 402 P.3d at 988.  It is also arbitrary and capricious if "the agency offers insufficient reasons for treating similar situations differently." *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C.Cir. 1999) (citations, quotation marks and brackets omitted).  *See also, Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007) ("A fundamental norm of administrative procedure requires an agency to treat like cases alike.  If [an] agency makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases."); *Mobile County Gas Dist. v. Mobile Gas Serv. Corp.*,  227 So.2d 565, 571 (Ala. 1969) (emphasis added) ("[I]t is essential that administrative rulings be consistent and that a radical departure from established interpretation and practice cannot be made except for compelling reasons.  To act in one manner in one case and the opposite manner in another case, where the circumstances are the same in all material respects, would be to act arbitrarily or, at best, unreasonably."); *In re Charles A. Field Delivery Serv.*, 66 N.Y.2d 516, 517, 488 N.E.2d 1223 (N.Y. 2007) ("A decision of an administrative agency which neither adheres to its own prior precedent nor indicates its reason for reaching a different result on essentially the same facts is arbitrary and capricious.").

[¶24]   In *Colorado Interstate Gas Co. v. F.E.R.C.*, 850 F.2d 769, 770 (D.C. Cir. 1988),  the Federal Energy Regulatory Commission classified Kansas's ad valorem property tax as a severance tax under the National Gas Policy Act but "simultaneously den[ied] severance tax treatment for Texas's seemingly indistinguishable tax."  The Court decided "the Commission's dissimilar treatment of evidently identical cases, on the same day, seems the quintessence of arbitrariness and caprice." *Id*. at 774.  The same result ensues here.  The Commission decided as to both applications based on the same evidence and on the same day that Exaro had met its burden of proof and the statutory requirements.  Yet, it approved 1902 and denied 1903.  The only reason it gave for the difference in treatment was the need for additional data.  But a need for additional data is inconsistent with the findings of the Commission that Exaro met its burden, and would have equally applied to 1902.  The Commission's inconsistent treatment of "evidently identical cases" without sufficient reason is arbitrary and capricious.

[¶25]   As a final matter, Jonah claims the Commission's written order pertaining to 1903 inadvertently contains findings of fact specific only to 1902 and does not accurately reflect the Commission's actual findings as to 1903 as evidenced by the comments of individual Commissioners at the hearing.  It argues that had the order been correctly written, the findings of fact would have "instead likely stated that 'waste is a possible outcome if Docket No. 1903-2018 is approved' because Exaro['s] evidence at the contested case hearing[] regarding north-south wellbore orientation was speculative, theoretical, and untested rather than empirical and supported by substantial evidence."

[¶26] We review the decision of the Commission, not the comments of individual Commissioners. Section 16-3-114(a) (allowing for review of "agency action"). In any event, Jonah misstates the comments of the individual Commissioners. None of those who voted to deny 1903 stated waste would occur. Commissioner Erin Campbell commented:

> My thoughts are based primarily on the orientation and the fact that, with the stress field documented at north 35 west, there's really a negligible difference between the north-south and east-west orientation based on what we know. And apparently we're just going to be testing this by drilling since there [is] no data. So my inclination would be to test this in 1902, but I'm not convinced of the need for 1903. But I would strongly recommend that, in the future wells, we get geomechanical data so we aren't doing this trial-and-error technique continually.

Commissioner Mark Doelger agreed with Commissioner Campbell:

> [T]he data most strongly supports the application of 1902. 1903 is weaker. I'd like to see a north-south test well drilled in 1902, get that data, get the data on the Tully well[8] and then consider the options from there.
> But I look at the Exaro testimony -- Exhibits E-8 and E-9 in particular for me were important because [they] show[] actual [estimated ultimate recovery] (EUR) data. And the orientation of 1902 sits squarely on high EURs and is entirely on high EURs, begins to fall off on 1903. The EUR data also supports the north-south orientation.
> I agree, this hard data is more meaningful to me than modeling; although, I mean, that was good testimony by Jonah on the geologic side, but that's modeling. And I didn't see any EUR data layered on top of that model that supported the model. And here with Exaro, I did see that.

Commissioner/then-Governor Matt Mead stated his concern was for the need for options if Exaro's proposed development "doesn't go well." The only indication that waste would occur came from Jonah's geologist and engineer, not from the Commissioners.

## CONCLUSION

---

[8] The Tully well is a horizontal well Jonah was in the process of drilling at the time of the hearing. It is located southwest of the subject lands and has a 70-degree azimuth.

[¶27]   The Commission found Exaro's evidence satisfied the statutory requirements for establishment of a DSU in both 1902 and 1903.  Substantial evidence supported that finding.  The Commission's decision to grant only one of the applications was arbitrary and capricious.

[¶28]   The Commission's order denying Exaro's application to establish a DSU in Docket No. 1903-2018 is reversed.

APPENDIX A



