# IN THE SUPREME COURT, STATE OF WYOMING

# 2021 WY 32

**OCTOBER TERM, A.D. 2020**

**February 18, 2021**

MARVIN MIRICH,

Appellant
(Petitioner),

v.

STATE OF WYOMING ex rel., BOARD OF
TRUSTEES OF LARAMIE COUNTY
SCHOOL DISTRICT TWO and LARAMIE
COUNTY SCHOOL DISTRICT NUMBER
TWO,

S-20-0134

Appellee
(Respondent).

*Appeal from the District Court of Laramie County*
*The Honorable Thomas T.C. Campbell, Judge*

*Representing Appellant:*
    Jason M. Tangeman of Nicholas & Tangeman, LLC, Laramie, Wyoming.

*Representing Appellee:*
    Scott E. Kolpitcke of Copenhave, Kath, Kitchen & Kolpitcke, LLC, Powell, Wyoming.

*Before DAVIS, C.J., and FOX, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    The Board of Trustees of Laramie County School District Number Two (the Board) dismissed Marvin Mirich from his teaching contract with Laramie County School District Number Two (the District) after an incident between him and his daughter at school.  At the crux of this dismissal was whether certain District policies and professional conduct standards applied to a teacher who disciplined his child—who also happened to be a student—on school grounds, during school hours.  The Board concluded they do and dismissed Mr. Mirich for violating those policies and standards.  The district court affirmed the dismissal.  It also affirmed the Board's decision to pay Mr. Mirich only a pro-rata portion of extra-duty pay for coaching track and no bonus following his suspension with pay.  Concluding that substantial evidence supports the Board's dismissal decision, but there is no Board decision on pay for this Court to review, we affirm.

## ISSUES

[¶2]    The dispositive issues are:

> I. Does substantial evidence support the Board's decision to
> dismiss Mr. Mirich?
>
> II. Is there a Board decision on extra-duty or bonus pay for this
> Court to review?

## FACTS

[¶3]    Mr. Mirich had been a full-time continuing contract teacher in the District since 1993.[1]  During the 2017/2018 school year, he taught physical education and coached track at Burns Junior/Senior High School (Burns High).  His daughter JM was a sophomore at Burns High and competed on the track team.  The incident resulting in dismissal occurred between Mr. Mirich and JM on Friday, March 9, 2018, at Burns High, during school hours. The facts regarding that incident are not in dispute.

[¶4]    The District had a four-day school week and Fridays were assigned a color—March 9 was a "Green Friday."  On Green Fridays, teachers were expected to be at school from

---

[1] A "Continuing Contract Teacher" includes "[a]ny initial contract teacher who has been employed by the same school district in the state of Wyoming for a period of three (3) consecutive school years and has had his contract renewed for a fourth consecutive school year[.]" Wyo. Stat. Ann. § 21-7-102(a)(ii) (LexisNexis 2019).  "A continuing contract teacher shall be employed by each school district on a continuing basis from year to year without annual contract renewal[.]"  Wyo. Stat. Ann. § 21-7-104(a) (LexisNexis 2019); *see* 2019 Wyoming Laws Ch. 84 (H.B. 22) (removing the "satisfactory performance evaluation" requirement from Wyo. Stat. Ann. § 21-7-104(a)).

1

approximately 7:30 a.m. to 12:30 p.m. and in their classrooms between 8:00 and 10:00 a.m. During those two hours, students could attend school to do extra work or catch-up work.

[¶5]    Mr. Mirich first saw JM in the gym shortly before 8:00 a.m. that morning. They discussed JM's poor performance on an obstacle course at track practice the night before. The conversation did not go well—JM called Mr. Mirich an "asshole" and then left for Heather Goodwine's classroom to work on the yearbook. When Mrs. Goodwine and Burns High students VD, MT, and MO saw JM in the classroom, they noticed that she seemed upset and had been crying.

[¶6]    Sometime later that morning, Danna Mirich—Mr. Mirich's wife/JM's mother— received a text message from JM in which JM stated that she was mad at her father, they got in an argument, and something to the effect of "this is why I should just die." Out of concern for JM, Mrs. Mirich sent her husband a text message asking him to find out what was going on. Mr. Mirich went to Mrs. Goodwine's classroom to talk to JM. He was upset that JM had called him an "asshole" and worried that JM had suggested she would harm herself. Mr. Mirich entered Mrs. Goodwine's classroom and asked to speak with JM. JM initially refused—saying "no, you're just going to yell at me[]"—but eventually acquiesced.

[¶7]    Video largely captured what occurred between Mr. Mirich and JM in the hallway outside Mrs. Goodwine's classroom.[2] Mr. Mirich, standing significantly taller than JM, looked down on her, pointed his finger in her face, and continually maneuvered himself in front of her. Mr. Mirich appeared angry. JM began walking away from Mr. Mirich.

[¶8]    As JM walked away, Mr. Mirich reached out, grabbed JM by the hood of her sweatshirt, and pulled her backward. JM fell to the ground on her back side. Mr. Mirich stood over her, still pointing, and did not help her up. When JM got up, he backed her into the lockers and twice appeared to bump her back into the lockers when she attempted to move away.

[¶9]    At the end of this encounter, JM pulled her sweatshirt up over her face and reentered Mrs. Goodwine's classroom. Around that time, HK entered the room and saw JM sitting on the ground crying with MO, MT, and VD gathered around her. Mrs. Goodwine left the room "to give [JM] and her friends a second."

[¶10]   Later that morning, Mr. Mirich returned to the classroom and again asked to speak with JM. He and JM then went to Athletic Director (AD) Barry Ward's empty classroom. Shortly after, HK and MO left Mrs. Goodwine's room and heard yelling and profanity coming from AD Ward's room. They informed Mrs. Goodwine they could hear Mr. Mirich yelling. MO asked if they should get the principal; Mrs. Goodwine said they should.

---

[2] The video did not include sound.

[¶11]  MO reported her concern to Principal Dishman and he went to AD Ward's room to find out what was going on.  The voices from within were not as loud as earlier reported, but he observed JM had been crying.  Mr. Mirich told Principal Dishman he had pulled JM down by her hood and that it would be on video.  Principal Dishman returned to his office and watched the video.  He conferred with District Superintendent Jon Abrams and then suspended Mr. Mirich pending an investigation.

[¶12]  On April 5, 2018, Superintendent Abrams issued Mr. Mirich a "Notice of Suspension with Pay and Recommendation of Dismissal."  The notice identified three statutory reasons for the recommendation: (1) neglect of duty, (2) failure to perform duties in a satisfactory manner, and (3) other good or just cause relating to the educational process.  It included the following allegations relevant to this appeal:[3]

> a.      On or about March 9, 2018, while at school, you were walking down a hallway with a student, JM, who is also your daughter.  As you were walking with her, you physically grabbed JM by the hood of her "hoodie", and yanked her backward, pulling her to the ground.
>
> b.      After you yanked JM to the ground, she got up, and you shoved or pushed her against the lockers in the hallway multiple times while talking to her in an aggressive, confrontational and intimidating manner.
>
> c.      Eventually, you walked away from JM, and she walked into her classroom.  She was crying and visibly upset when she walked into her classroom.
>
> d.      Several minutes after JM entered her classroom, you entered her classroom, and ordered her to follow you outside the classroom.  Your tone and demeanor frightened other students in the classroom.  At least one student reported that she moved to a corner of the classroom because she was frightened of you.
>
> e.      After you and JM left her [classroom], she followed you down the hall, and you both entered another classroom, where you spoke to her in a loud, angry tone, and used profanities when yelling at her.

---

[3] The notice also included allegations about Mr. Mirich's phone and computer use while teaching classes, as well as his use of profanity while coaching football.  However, the Board dismissed Mr. Mirich based solely on his March 9, 2018 conduct.  We narrow our discussion accordingly.

f.      JM's classmates in her classroom could overhear you yelling at her, and could hear you using profanities. It frightened them enough that they went to get the principal, Mr. Dishman, to intervene.

g.      After this incident, you were advised to leave the school, and that you were suspended with pay. At some point that day, you sent a text message to school board members in which you made statements about the incident, some of which misstated the facts. For example, you stated in your text message that after JM "fell backwards" you "helped her up." That statement is not true.

The notice informed Mr. Mirich that his conduct violated the District's "Harassment, Intimidation, and Bullying" and "Professional Ethics" policies, as well as the Wyoming Professional Teaching Standards Board (PTSB) "Professional Conduct Guide."

[¶13]  Mr. Mirich requested a contested case hearing pursuant to Wyo. Stat. Ann. § 21-7-110(c), and the Office of Administrative Hearings (the OAH) held a three-day hearing at the end of October 2018. Thirteen witnesses testified in person and two testified by deposition. The Superintendent's witnesses included Mr. and Mrs. Mirich. In addition, VD, HK, MT, MO, and Mrs. Goodwine addressed the March 9 incident. Principal Dishman and Superintendent Abrams discussed the investigation and the basis for the dismissal recommendation. Mr. Mirich testified on his own behalf and called several witnesses to testify about his character and abilities as a teacher and coach, including his ability to reach difficult students.

[¶14]  The Hearing Officer issued his "Recommended Findings of Fact, Conclusions of Law, and Order" the following month. He recommended the Board dismiss Mr. Mirich for the reasons stated in the notice. He further recommended the Board find that Mr. Mirich's conduct violated the policies and conduct guide identified in the notice. The Board adopted the Hearing Officer's recommendations in relevant part and dismissed Mr. Mirich. He petitioned the district court for review, the court affirmed, and this appeal followed.

*STANDARD OF REVIEW*

[¶15]  "When an appeal is taken from a district court's review of an administrative agency's decision, we examine the case as if it had come directly from the agency, giving no deference to the district court's decision." *Sweetwater Cty. Sch. Dist. No. One v. Goetz*, 2017 WY 91, ¶ 23, 399 P.3d 1231, 1235 (Wyo. 2017) (citation omitted). Wyo. Stat. Ann. § 16-3-114(c) governs our review:

4

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

> (i) Compel agency action unlawfully withheld or unreasonably delayed; and

> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

>> (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

>> . . . .

>> (E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2019).

[¶16] "When, as here, both parties submitted evidence at the contested case hearing and an agency's factual findings are involved, we apply the substantial evidence standard of review." *Exaro Energy III, LLC v. Wyoming Oil & Gas Conservation Comm'n*, 2020 WY 8, ¶ 10, 455 P.3d 1243, 1248 (Wyo. 2020) (citing *Dale v. S & S Builders, LLC*, 2008 WY 84, ¶ 10, 188 P.3d 554, 558 (Wyo. 2008)). Under that standard

> "we examine the entire record to determine whether there is substantial evidence to support an agency's [factual] findings. If the agency's decision is supported by substantial evidence, we cannot properly substitute our judgment for that of the agency and must uphold the findings on appeal. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions. It is more than a scintilla of evidence."

*Id.* (quoting *Dale*, ¶ 11, 188 P.3d at 558). Because the agency, as the trier of fact, weighs the evidence and determines witness credibility, we defer to its factual findings unless they

5

are "clearly contrary to the overwhelming weight of the evidence on the record." *Id.* (quoting *Dale*, ¶ 11, 188 P.3d at 558).[4] "Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it." *Dale*, ¶ 22, 188 P.3d at 561.

### *DISCUSSION*

### I.      *Substantial evidence supports the Board's decision dismissing Mr. Mirich.*

[¶17]   "It is axiomatic that the courts should not undertake to administer the school systems of Wyoming.  We should not substitute our judgment in educational matters for those of school boards and administrators." *Powell v. Bd. of Trustees of Crook Cty. Sch. Dist. No. 1, Crook Cty.*, 550 P.2d 1112, 1113 (Wyo. 1976).  "[T]he general public—indeed, all of society, has a massive interest in maintaining good schools.  'Good schools' means good teachers—and by 'good teachers' we mean 'good' in all important aspects of their professional lives." *Id.*  "If the teacher does not measure up, according to reasonable standards of professional requirement, the teacher may be removed, but in the process of removal, all the rights and interests of all of those concerned must be considered." *Id.*  "In protecting all of these various rights, the court must see that the rules and the law" are followed. *Id.*

[¶18]   The Wyoming Teacher Employment Law provides:

> (a) The board may suspend or dismiss any teacher, or terminate any continuing contract teacher, for **any** of the following reasons:
>
>> (i) Incompetency;
>>
>> (ii) Neglect of duty;
>>
>> (iii) Immorality including, without limitation, engaging in conduct with a student which would be a violation of

---

[4] "Even if an agency record contains sufficient evidence to support the administrative decision under the substantial evidence test, this Court applies the arbitrary-and-capricious standard as a 'safety net' to catch other agency action that may have violated the Wyoming Administrative Procedures Act." *Exaro Energy*, ¶ 11, 455 P.3d at 1248–49 (quoting *Rodgers v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2006 WY 65, ¶ 19, 135 P.3d 568, 575 (Wyo. 2006)).  "Under the umbrella of arbitrary and capricious actions would fall potential mistakes such as inconsistent or incomplete findings of fact or any violation of due process." *Id.* ¶ 11, 455 P.3d at 1249 (quoting *Rodgers*, ¶ 19, 135 P.3d at 575).  Mr. Mirich mentions this standard several times but his arguments do not implicate this "safety net."

W.S. 6-2-314 through 6-2-318, 12-6-101(a) or 35-7-1036;

(iv) Insubordination;

(v) Physical incapacity to perform job duties even with reasonable accommodation;

(vi) Failure to perform duties in a satisfactory manner;

(vii) Repealed by Laws 2019, ch. 84, § 2[, eff. July 1, 2019;]

(viii) Conviction of a felony; and

(ix) Any other good or just cause relating to the educational process.

Wyo. Stat. Ann. §§ 21-7-110(a) (emphasis added), 21-7-101 ("This article shall be known and cited as the Wyoming Teacher Employment Law.") (LexisNexis 2019).

[¶19] As noted above, the Board relied on three of those reasons to dismiss Mr. Mirich: (ii) neglect of duty, (vi) failure to perform duties in a satisfactory manner, and (ix) any other good or just cause relating to the educational process. To affirm, we need only determine that substantial evidence supports the Board's decision to dismiss Mr. Mirich for one of those reasons. We conclude the Board had before it substantial evidence of "good or just cause relating to the educational process" to dismiss Mr. Mirich.

### A. Good or Just Cause Relating to the Educational Process

[¶20] Mr. Mirich's appeal stems primarily from two limits we have placed on use of the "good or just cause" basis for dismissal. First, we have stated that "'[g]ood cause' cannot be just any reason that the Board deems sufficient for the discharge of the teacher." *Powell*, 550 P.2d at 1118. "Not only must there be 'good cause' and substantial evidence in support of the charge," the facts "must bear reasonable relationship to the teacher's fitness or capacity to perform his duties in that position." *Id.* at 1119 ("hold[ing] that a general charge of 'inability to establish rapport with his students,' unsupported by definition and specific facts[,]" was insufficient to constitute good or just cause). The statute "assume[s] facts which bear a relationship to the teacher's ability and fitness to teach and discharge the duties of his or her position." *Id.*; *see also Spurlock v. Bd. of Trustees, Carbon Cty. Sch. Dist. No. 1*, 699 P.2d 270, 275–76 (Wyo. 1985) (affirming as to dismissal from the position of principal but reversing as to dismissal from the position of teacher because, among other

things, the evidence bore "no relationship to appellant's ability and fitness to teach and discharge the duties of a classroom teacher"—it pertained to his position as principal).

[¶21] Second, we have stated that "good or just cause" "cannot be established by proof of the violation of standards that do not exist." *Bd. of Trustees of Weston Cty. Sch. Dist. No. 1, Weston Cty. v. Holso*, 584 P.2d 1009, 1015 (Wyo. 1978) (reversing a termination decision that had been based on the teacher's grading practices—he "historically gave more D and F grades than would appear on a normal probability curve"—because the District had "no formal grading policy, nor was [the teacher] ever told to grade 'on the curve'"). "[A] clear standard of conduct must be furnished to the teacher and its violation relied upon in order to justify termination." *Ririe v. Bd. of Trustees of Sch. Dist. No. One, Crook Cty., Wyo.*, 674 P.2d 214, 227 (Wyo. 1983) (concluding the teacher had been furnished a clear standard—the position description—on his need to communicate effectively with staff members).[5]

### 1. Clear Standards of Conduct

[¶22] The Board relied on Mr. Mirich's violation of the policies and conduct guide identified in the notice to dismiss Mr. Mirich for "good or just cause." It found those policies and that conduct guide applied to Mr. Mirich's March 9 conduct, even though the incident involved his daughter. About that incident, it specifically found:

> (a) Mirich twice interrupted other students in Goodwine's classroom when asking to speak with JM;
>
> (b) Mirich used loud, profane, and abusive language toward JM that was overheard by several other students;
>
> (c) Mirich's conduct was so loud and disruptive that students became concerned and sought help from Principal Dishman;
>
> (d) while in the hallway, Mirich used his size over JM to intimidate and bully JM and he continually maneuvered himself to be directly in front of JM;

---

[5] "Wyoming's Teacher Employment Law distinguishes between 'dismissal' and 'termination.' Dismissal is the cancellation of a teacher's contract during the term in which it is in effect. Wyo. Stat. Ann. § 21-7-102(a)(iii). Termination is a failure by the Board to renew a teacher's contract for an upcoming year. § 21-7-102(a)(viii)." *Laramie Cty. Sch. Dist. No. One ex rel. Bd. of Trustees of Laramie Cty. Sch. Dist. No. One v. Kinstler*, 2015 WY 143, ¶ 3 n.3, 361 P.3d 819, 820 n.3 (Wyo. 2015). The clear standard of conduct requirement applies in either instance.

8

(e) when JM walked away from Mirich, he pulled her to the ground, stood over her without helping her up, and continued to intimidate and bully JM while she sat on the ground;

(f) once JM got to her feet, Mirich backed her into the lockers and appeared to physically block her from walking away;

(g) JM was so upset throughout the incident that the other students in Goodwine's classroom stopped their activities to comfort JM; and

(h) when Mirich returned and took JM to AD Ward's classroom, his voice was so loud behind closed doors that others could hear him yelling and using profane language.

Mr. Mirich does not dispute these findings and, contrary to his assertion, the standards against which the Board would measure his conduct were clear and made known to him.[6]

[¶23] In April 2017, Mr. Mirich signed a "Continuing Teacher's Employment Contract for the 2017-2018 School Year." By signing the contract, he agreed to comply with District rules, regulations, and policies. The contract further reflected his acknowledgment that he had the responsibility to be familiar with those rules, regulations, and policies.

[¶24] The Harassment, Intimidation, and Bullying policy (Exhibit K) states that "[h]arassment, intimidation or bullying of students by students, of students by staff, or of staff by students at any school or school sponsored or school operated activity is prohibited." It defines "[h]arassment, intimidation, or bullying [as] any intentional gesture, or any intentional written, verbal or physical act that a reasonable person under the circumstances should know will have the effect of":

1. Harming a student physically or emotionally, damaging a student's property or placing a student in reasonable fear of personal harm or property damage;

2. Insulting or demeaning a student or group of students causing substantial disruption in, or substantial interference with, the orderly operation of school; or

---

[6] Mr. Mirich attempts to reframe the basis for his dismissal, contending "there was no evidence [he] violated any clear rule or standard by leaving the gym (his classroom) as he did not have any students that day" or "by going to find his daughter and discuss with her the serious topic of a potential suicide." But the record makes clear the Board did not dismiss him for either of these reasons.

3. Is so sufficiently severe, persistent or pervasive that it creates an intimidating, threatening or abusive educational environment for a student or group of students.

The Professional Ethics policy (Exhibit N) states that District employees "will at all times: 1. Uphold the honor and dignity of their profession in all actions and relations with pupils, colleagues, school board members, and the public." The Professional Conduct Guide (Exhibit O) requires teachers to "[m]odel appropriate language for students" and stated that "[t]he use of profanity, vulgarity, put downs, sarcasm, or name calling is inappropriate at all times in the presence of students." We refer to these policies and conduct guide collectively as "standards of conduct."

[¶25] In applying these standards of conduct, Superintendent Abrams acknowledged that Mr. Mirich had confronted a student who also happened to be Mr. Mirich's daughter. But, in his opinion, that did not "mitigate or somehow change [Mr. Mirich's] responsibilities as a teacher[.]" Superintendent Abrams heard Mr. Mirich's testimony that he did not think he violated the policies in part because the incident involved his daughter and he acted as her parent. However, in Superintendent Abrams' opinion, nothing in the policies supported this conclusion. Superintendent Abrams explained that no separate set of policies or rules governed a teacher's interaction with a student who happened to be the teacher's own child; his concern for the student was no different when the student was the teacher's child; and Mr. Mirich was still a teacher—and the District was paying him as a teacher—on March 9. Principal Dishman testified similarly. Mr. Mirich does not identify any evidence showing he was entitled to an exception, and we found no such evidence in the record.

### 2. Substantial Evidence Mr. Mirich Violated the Standards of Conduct

[¶26] Other than his overarching argument that he could not have violated the standards of conduct because the incident involved his daughter, Mr. Mirich presents no additional challenge to the Board's finding that he violated the District's Harassment, Intimidation, and Bullying policy or Professional Ethics policy. He does present an additional challenge to the Board's finding that he violated the Professional Conduct Guide. The record provides substantial evidence to support the Board's finding that he violated both District policies, as well as the conduct guide.

[¶27] The Harassment, Intimidation, and Bullying policy prohibits "any . . . physical act that a reasonable person under the circumstances should know will have the effect of" "[h]arming a student physically or emotionally" or "[i]nsulting or demeaning a student . . . causing substantial disruption in, or substantial interference with, the orderly operation of school[.]" Superintendent Abrams testified that, based on his review of the video and what he learned through the investigation, Mr. Mirich violated the policy. He noted that Mr. Mirich grabbed the student, threw her to the ground, waited for her to get up, and then "got in her face." "All 6'4'' or 6'5'' of him got in the face of a student, backed her against the

lockers, and intimidated her as he pushed her down the hall -- well, if not physically, just through the use of his body." It was "hard to watch." Principal Dishman similarly opined that Mr. Mirich violated the policy.

[¶28] The Professional Ethics policy requires teachers to "[u]phold the honor and dignity of their profession in all their actions and relations with pupils, colleagues, school board members, and the public." Superintendent Abrams testified that the way Mr. Mirich treated JM and interrupted Mrs. Goodwine's class violated that requirement. Principal Dishman testified similarly.

[¶29] The Hearing Officer admitted a copy of the video reflecting what occurred in the hallway outside Mrs. Goodwine's classroom. VD, HK, MT, MO, and Mrs. Goodwine addressed how the incident, as a whole, disrupted students that morning. Their testimony reflects that Mr. Mirich came to Mrs. Goodwine's room and asked to speak to JM, at which time she reluctantly joined him in the hallway. When JM returned she was upset and students tried to comfort her. Mr. Mirich returned and asked to speak to JM again, at which time JM followed him to AD Ward's room. HK and MO heard Mr. Mirich yelling, asked Mrs. Goodwine what they should do, she advised them to get Principal Dishman, and MO reported the yelling to Principal Dishman. JM returned to Mrs. Goodwine's room, still upset. When asked what impact the incident had on her class and students Mrs. Goodwine testified that "[n]o work got done. And it was upsetting." This evidence is more than a scintilla, it is relevant, and it supports the Board's finding that Mr. Mirich violated both District policies on March 9. We will not substitute our judgment for that of the Board.

[¶30] With respect to the Professional Conduct Guide, Mr. Mirich does not dispute that he used profanity. Instead, he asserts there is no evidence that he used profanity "in the presence of students," as prohibited by the conduct guide. At the hearing, Mr. Mirich admitted he used the words "chicken-shit or bullshit" when speaking to JM. Mr. Mirich argues this profanity could not have violated the conduct guide because he used it in his capacity as a father toward his daughter, not a teacher toward his student. The evidence, however, reflects that JM was a Burns High student and that Mr. Mirich used the profanity on campus, during school hours, while being paid as a teacher. Mr. Mirich points to no evidence of a teacher-parent exception.

[¶31] HK testified that when she left Mrs. Goodwine's classroom she heard Mr. Mirich yelling and using "cuss words"; she could not recall which words he had used. MO similarly testified that when she left Mrs. Goodwine's classroom, she heard Mr. Mirich use profanity—specifically, "[t]hat it was like F'ing BS that [JM] acted this way." Mr. Mirich asserts the profanity that HK and MO overheard could not have violated the conduct guide because HK and MO were not in his direct physical presence. The guide broadly states that a teacher must "[m]odel appropriate language for students. The use of profanity . . . is inappropriate at all times in the presence of students." Physical presence is nowhere specified—profanity within students' earshot clearly is inappropriate. Thus, substantial

11

evidence also supports the Board's finding that Mr. Mirich violated the Professional Conduct Guide.

### 3. Reasonable Relationship

[¶32]  Mr. Mirich asserts "the Board made absolutely no finding as to how the March 9th incident bore any relationship to [his] abilities as a teacher." While the Board did not make any separate "relationship" findings, its findings are sufficient to explain, and the record contains sufficient evidence to support, the Board's decision in this regard. *See Bush v. State ex rel. Wyoming Workers' Comp. Div.*, 2005 WY 120, ¶ 12, 120 P.3d 176, 180–81 (Wyo. 2005).

[¶33]  As identified above in ¶ 22, the Board made findings about how Mr. Mirich treated JM and how his conduct affected other students at Burns High that Friday morning. The standards of conduct the Board found Mr. Mirich violated on March 9 directly pertain to a teacher's duty with respect to treatment of and behavior around students. Along those lines, Superintendent Abrams testified that he recommended dismissing Mr. Mirich based on how he had treated and behaved around students:

> He acted in an unprofessional way. He broke one of the cardinal rules of how you treat students.
>
> You don't get to grab a student and throw them to the floor. You don't get to get in their face and use profanity. You don't get to intimidate and bully them. You don't get to disrupt the classroom environment. And you don't get to use foul language, even if everybody else says it's okay.

It is readily apparent why the Board, in dismissing Mr. Mirich for "good or just cause," necessarily found that the March 9 incident bore a relationship to Mr. Mirich's abilities as a teacher. And, as shown, the record contains substantial evidence to support that finding.

### 4. Progressive Discipline

[¶34] Mr. Mirich's final challenge to his dismissal stems from his counsel's cross-examination of Superintendent Abrams on a method of documenting teacher conduct and behavior—referred to as the "McGrath Method"—and on progressive discipline training materials—referred to as the "Lawrence and Vachon" materials. Superintendent Abrams agreed that the McGrath Method teaches the importance of documentation and recordkeeping in the administration of school district personnel matters. The Lawrence and Vachon materials refer to the term "progressive discipline," which Superintendent Abrams described as "dealing with an issue . . . a step at a time." The first step may involve an oral warning, followed by an oral reprimand, a misconduct meeting, a letter of

reprimand, a suspension with or without pay, and the most serious, a recommendation for termination.

[¶35]   Mr. Mirich faults the Board for not providing any rationale for the District's failure to follow progressive discipline and consider a lesser sanction than dismissal in his case. His suggestion that reversal is warranted on this basis suffers three faults.

[¶36]   First, Mr. Mirich cites no legal authority, and we found none, that requires Districts in Wyoming to strictly follow progressive discipline. The Wyoming Teacher Employment Law identifies the reasons a teacher may be dismissed. Wyo. Stat. Ann. § 21-7-110(a). Nowhere does it require a District impose progressive discipline before dismissal. *See* Wyo. Stat. Ann. §§ 21-7-101 to -113.

[¶37]   Second, Superintendent Abrams testified that the District had not adopted any policy "that requires [it] to use progressive discipline as a matter of course in every disciplinary action regarding employees[.]"   Nor had the District adopted the McGrath Method.   Mr. Mirich has not directed our attention to, nor have we found, anything in the record to the contrary.

[¶38]   Third, the evidence reflects that not even the McGrath Method requires progressive discipline in every case.   Superintendent Abrams agreed with the concept of progressive discipline, with the understanding that it depends on the situation.   He testified that the McGrath Method does not dictate that every disciplinary action should follow strict progressive discipline; rather, the method advises a case-by-case examination.   In Superintendent Abrams' opinion, his recommendation to dismiss Mr. Mirich was consistent with his training on the McGrath Method.   Based on this evidence the Board could reasonably conclude dismissal was warranted.

## II.    *There is no Board decision on extra-duty or bonus pay for this Court to review.*

[¶39]   Mr. Mirich argues the Board's decision denying him full extra-duty pay and a bonus after suspending him "with pay" is arbitrary, capricious, an abuse of discretion, and otherwise not supported by substantial evidence.   The Board responds that we do not have jurisdiction to address the issue because (1) the Wyoming Teacher Employment Law statutes do not allow teachers to request a hearing on extra-duty pay or bonus decisions, and (2) Mr. Mirich did not present the pay issue to the OAH or the Board for a decision. Because we agree with the Board's second contention, we need not address the first.

[¶40]   The District suspended Mr. Mirich "with pay" on April 5, 2018.   Mr. Mirich requested a contested case hearing pursuant to Wyo. Stat. Ann. § 21-7-110(c) on April 10. There is no dispute that, after suspending him with pay, the District paid Mr. Mirich his salary and only a pro rata portion of extra-duty pay for coaching track.   It did not pay him the 2% bonus it paid other staff members in mid-April.   On April 17, Mr. Mirich sent

Superintendent Abrams a letter demanding "full payment of his track coaching extra duty contract and tenured teacher bonus."

[¶41]   Nevertheless, when the OAH ordered each party to file and serve on all other parties and the OAH "[a] statement of the specific claims, defenses, and issues which the party asserts are presently before this Office for hearing," Mr. Mirich did not identify the Board's denial of extra-duty or bonus pay as a "claim" or "issue" in any of his pre-hearing memoranda.  In his initial pre-hearing memoranda, dated June 1, Mr. Mirich asserted that he had no claims because he did not carry the burden of proof.  Mr. Mirich's first supplement, dated June 11, added deposition transcripts from two Burns High students to his list of exhibits, but made no mention of pay.  His second supplement, dated October 9, added witnesses and exhibits related to the PTSB, but again made no mention of pay.

[¶42]  Nor did Mr. Mirich raise denial of extra-duty or bonus pay as an issue at the contested case hearing in October.  His counsel did not mention pay in opening statement. He briefly cross-examined one witness, Superintendent Abrams, about denial of extra-duty and bonus pay.  He also introduced copies of the District's April 16 letter to staff regarding the 2% bonus and his April 17 demand for payment as exhibits.  But counsel provided no adversarial context or claim under which the Hearing Officer could consider or weigh that testimony or those exhibits.  In fact, before asking Superintendent Abrams follow-up questions about various matters, the Hearing Officer expressly stated that he was "not entirely sure what relevance [pay] may have."  The Hearing Officer then speculated, with no clarification from counsel, that it might relate to Mr. Mirich's retirement calculation. Mr. Mirich's counsel did not mention pay in closing argument.

[¶43]  Hence, the Hearing Officer's "Recommended Findings of Fact, Conclusions of Law, and Order" did not address pay.  The issue took form for the first time in Mr. Mirich's exceptions to the recommended findings, conclusions, and order, when he requested that "the OAH make a finding he is owed his bonus and extra-duty stipend."  But addressing the OAH's findings with the Board, Mr. Mirich's counsel only briefly mentioned pay in the course of arguing that Mr. Mirich had been "singled out."  He noted that Mr. Mirich "was suspended with pay, yet he didn't receive the bonus, like all other teachers in the district.  He was suspended with pay, but he lost his track stipend, he wasn't paid that." The Board did not address pay in its decision.

[¶44]  To the extent Mr. Mirich raised the pay issue below, it was too little, too late.  S*ee Davenport v. State, ex rel., Wyoming Workers' Safety & Comp. Div.*, 2012 WY 6, ¶ 20, 268 P.3d 1038, 1043 (Wyo. 2012) (citation omitted) ("The rule that a party cannot raise issues on appeal which were not argued below applies to administrative decisions.").  By not timely raising a claim pertaining to his extra-duty or bonus pay, the Board had no opportunity to challenge, as it has done here, whether the Wyoming Teacher Employment Law statutes allow a teacher to dispute denial of pay in contested case proceedings under Wyo. Stat. Ann. § 21-7-110.  In addition, the facts regarding pay were not well-developed

at the hearing. *See Mekss v. Wyoming Girls' Sch., State of Wyo.*, 813 P.2d 185, 201 (Wyo. 1991) ("One of the fundamental purposes of the Wyoming Administrative Procedure Act is to assure that controverted issues involved in any contested case will be fully developed before the agency as a finder of fact."). Finally, the Hearing Officer made no recommendation and the Board issued no decision on pay. Consequently, there are no findings of fact or conclusions of law for our review under Wyo. Stat. Ann. § 16-3-114(c). *See Bush*, ¶ 11, 120 P.3d at 180 ("A reviewing court has authority only to review an agency decision, not to make the decision for it.").

### *CONCLUSION*

[¶45] The Board had before it substantial evidence of "[a]ny other good or just cause relating to the educational process[,]" Wyo. Stat. Ann. § 21-7-110(a)(ix), to justify its decision dismissing Mr. Mirich. There is, however, no Board decision on extra-duty or bonus pay for this Court to review.

[¶46] Affirmed.