# IN THE SUPREME COURT, STATE OF WYOMING

## 2022 WY 23

OCTOBER TERM, A.D. 2021

February 9, 2022

BOARD OF TRUSTEES OF LINCOLN
COUNTY SCHOOL DISTRICT NUMBER
TWO,

Appellant
(Respondent),

v.                                                                    S-21-0121

WYATT EARLING,

Appellee
(Petitioner).

*Appeal from the District Court of Lincoln County*
*The Honorable Joseph B. Bluemel, Judge*

*Representing Appellant:*
> Blaine F. Burgess and Hannah West of Williams, Porter, Day & Neville P.C., Cheyenne, Wyoming. Argument by Mr. Burgess.

*Representing Appellee:*
> Gregory P. Hacker of Hacker, Hacker & Kendall, P.C., Cheyenne, Wyoming.

*Before FOX, C.J., and DAVIS\*, KAUTZ, BOOMGAARDEN, and GRAY, JJ.*

*\*Justice Davis retired from judicial office effective January 16, 2022, and, pursuant to Article 5, § 5 of the Wyoming Constitution and Wyo. Stat. Ann. § 5-1-106(f) (LexisNexis 2021), he was reassigned to act on this matter on January 18, 2022.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**BOOMGAARDEN, Justice.**

[¶1]    The Board of Trustees of Lincoln County School District Number Two dismissed Wyatt Earling from his teaching position pursuant to Wyo. Stat. Ann. § 21-7-110(a)(ix) after Superintendent Matt Erickson discovered inappropriate photos and images on an Apple iPad the District issued to Mr. Earling several years prior.  The photos and images had "synced" from Mr. Earling's personal Apple iPhone to the iPad, which he kept at his home as a backup during the 2018-2019 school year.[1]   The district court reversed the Board's decision and the Board appeals.  We affirm the district court's decision.

## ISSUES

[¶2]    The dispositive issues[2] are:

> I. Did the Board furnish Mr. Earling a clear standard of conduct?
>
> II. Is the Board's finding that the facts bear a reasonable relationship to Mr. Earling's fitness or capacity to perform his duties as a teacher contrary to the overwhelming weight of the evidence?

## FACTS

[¶3]    Mr. Earling had been teaching second grade in Lincoln County, Wyoming, for 15 years.  When he was hired in 2004, the District issued him an Apple laptop.  He created an Apple ID using his District email address and then continued using that same Apple ID—on both personal and District-issued Apple devices—for the next 15 years.[3]

[¶4]    By the 2018-2019 school year, Mr. Earling had numerous District-issued Apple products, including a classroom set of iPads for his students, a laptop he used to teach in the classroom, and two outdated iPads at his home.[4]  The screen on one of the iPads was broken so he did not use it.  He periodically used the other iPad for work email.  He also

---

[1] Syncing is a process where two or more Apple devices signed into the same Apple ID share content, including photos, images, applications, e-mails, and search histories.  Syncing could be activated or deactivated manually, it could turn on automatically through a system update, and acceptance of terms or conditions could alter sync settings.

[2] Because we affirm, we do not address whether the Board's decision violated Mr. Earling's due process rights.

[3] Mr. Earling described an Apple ID as a log-in to use Apple devices and applications.  The District did not issue him an Apple ID in 2004 so he created one using his District email address.  The District recently started issuing teachers Apple IDs.

[4] The District periodically provided teachers new iPads and laptops.  It expected teachers to timely trade in their outdated device for a new one, but they sometimes delayed doing so and kept the old device instead.

1

allowed his daughters to download apps, play games, and watch videos on the iPad when they were at his home.[5]

[¶5]   In May 2018, Mr. Earling purchased his first Apple iPhone for personal use and activated it using his Apple ID.[6]   At some point after that, unbeknownst to Mr. Earling, personal photos and images from his iPhone began syncing to the iPad.

[¶6]   In March 2019, Superintendent Erickson received a phone call from Jody Gardner of the Wyoming Department of Family Services.  Mr. Gardner informed the superintendent that he had received a report from Mr. Earling's ex-wife that there may be inappropriate, pornographic, and sexually explicit images stored on a District iPad issued to Mr. Earling.  She further reported that her and Mr. Earling's children may have seen the images.

[¶7]   On receiving this information, the superintendent drove to the school where Mr. Earling taught and told the principal, Lori Schieffer, about the phone call.  She removed Mr. Earling from his classroom and brought him to the front office where Superintendent Erickson asked Mr. Earling where the iPad was and he said it was at his home.  All three of them then drove to Mr. Earling's home so he could retrieve the iPad.  When they returned to the school, the superintendent retained possession of the iPad and began an investigation.

[¶8]   With help from the District's Director of Technology Kyle Weber and IT employee Tanner Crook, the superintendent reviewed the photos and images stored on the iPad.  He found approximately 1,000 images, the vast majority of which were personal, but not inappropriate.   There were, however, 50 photos and images that the superintendent considered graphic, pornographic, sexually explicit, obscene, and inappropriate for a District device.[7]

[¶9]   Unaware of what on the iPad might be objectionable, Mr. Earling asked his children whether they saw anything inappropriate on it and learned that one of his children saw a photo of him and his then-girlfriend, now wife, on vacation in Mexico.  As Mr. Earling took his iPhone on the trip to Mexico he began to suspect that photos somehow transferred from it to the iPad.

[¶10] At the end of March, Superintendent Erickson met with Mr. Earling.  At the beginning of the meeting, the superintendent provided Mr. Earling a letter outlining his

---

[5] Mr. Earling divorced in 2017.  He and his ex-wife shared custody of their two elementary-aged children, who were students in the District.

[6] The Board's order states that Mr. Earling bought the iPhone in Spring 2019, but he testified that he bought it in May 2018.

[7] After his divorce, Mr. Earling began a romantic relationship with a woman he married in 2019.  The 50 photos and images at issue included nude photos of them; screen shots of their text messages that contained sexually suggestive content; and "memes" that contained profanity and sexually explicit jokes.  The photos, text messages, and images were created, downloaded, and shared in the context of their consensual, private relationship.

initial findings, including that there was "pornographic/obscene material" on the iPad. The superintendent then allowed Mr. Earling to provide his side of the story. Mr. Earling explained that the iPad had been at his home as a backup for the 2018-2019 school year; he believed the photos and images had synced from his personal iPhone to the iPad because he signed into both with the same Apple ID; he did not know this was occurring; he had not used the iPad to teach; and he did not intentionally store the photos and images on the iPad. Mr. Earling was remorseful, emotional, and embarrassed. The superintendent placed Mr. Earling on administrative leave pending completion of a full investigation.

[¶11]  In early April, after completing his investigation, Superintendent Erickson initiated these proceedings by giving Mr. Earling a Notice of Termination. As set forth there, the superintendent concluded:

- Mr. Earling violated the District's "Employee Acceptable Use of Technology" procedure (EHAA-R);

- Mr. Earling violated the District's "Authorized Use of District-owned Materials and Equipment" procedure (EDC-R);

- "Mr. Earling caused or allowed graphic pornographic material to be placed or stored on a [District] device, violating other policies and potentially placing students and staff at risk by coming in contact with the harmful material";

- "Mr. Earling's actions constituted immorality, placed students and staff at risk, and was harmful to the educational process"; and

- Mr. Earling's actions were grounds for suspension or dismissal under Wyo. Stat. Ann. § 21-7-110.

The superintendent intended to recommend the Board terminate Mr. Earling's employment.

[¶12]  On Mr. Earling's request, the Office of Administrative Hearings held a contested case hearing where the issue was whether Superintendent Erickson proved that the basis for Mr. Earling's termination was for the reasons stated in the Notice of Termination—namely, "immorality" under § 21-7-110(a)(iii) and "[a]ny other good or just cause relating to the educational process" under § 21-7-110(a)(ix). *See* Wyo. Stat. Ann. § 21-7-110(e). Six witnesses testified: Superintendent Erickson, District Secretary Amanda Welch, Principal Schieffer, Mr. Weber, Mr. Crook, and Mr. Earling. The parties submitted numerous exhibits, including copies of the policies and procedures at issue. We highlight some of that testimony and the two pertinent policies and procedures—the EHAA and

3

EHAA-R[8]—to place the Board's ruling in better context, reserving further discussion of the evidence as relevant to our discussion.

[¶13] Mr. Weber and Mr. Crook testified that there were several ways the photos and images could have ended up on the iPad. First, the photos and images could have been created on the iPad. That is, the photos could have been captured with the iPad's camera and the images could have been created on the iPad. Second, the photos could have been downloaded to the iPad through a wired connection to another device, such as a camera. Third, the photos and images could have synced between two or more devices. Mr. Weber and Mr. Crook confirmed that the pertinent sync setting was activated on the iPad when the superintendent received it from Mr. Earling.

[¶14] In Mr. Weber's opinion, the images ended up on the device either through syncing or they were taken with the device. Mr. Crook had no basis to believe the images got on the iPad any way besides syncing. And Superintendent Erickson had no evidence the images were taken on the device. He "believe[d] that somehow through the internet, they were synced, transferred, published, accessed on [the iPad]."

[¶15] Superintendent Erickson testified why he believed Mr. Earling violated the Board's policies and procedures. Pertinent to this appeal, the "EHAA" was an "Acceptable Use Policy" that Mr. Earling acknowledged in September 2018. It applied to all District employees, District devices, and devices connected to the District's internal network. It stated that District devices "are primarily to be used for work related purposes except as otherwise provided"; employees should not expect privacy on District devices or devices connected to the District's internal network; access rights may be revoked; and the District would implement measures to secure "devices used to access sensitive information."

[¶16] The "EHAA-R" was a corresponding procedure on "Employee Acceptable Use of Technology" that Mr. Earling acknowledged in September 2018. It included eight sections, which contained subsections.

- Section 1.0, entitled "Purpose," stated that District employees were permitted and encouraged to use computers and network resources in support of the District's goals and objectives. Personal use of District devices was permitted if it conformed to District policies, including those on computer use and student data security. "The purpose of Board Policy EHA,

---

[8] The EDC-R addressed authorized use of District materials and equipment. It explained that "District equipment [was] to be used primarily for educational purposes." But, with a supervisor's prior written approval, employees could take District equipment off campus for professional or personal use to acquire new skills and keep up with changing technology. It further addressed liability for damage to equipment used off campus and informed employees that the administration would monitor private and personal use of District equipment. There was no allegation that Mr. Earling inappropriately used the iPad for personal use or inappropriately kept the iPad at his home.

4

EHAA, GBCD, EDC and their accompanying procedure [was] to protect student data privacy and also to protect [District staff]."

- Section 2.0, entitled "Access to Technology Equipment and Services," explained that technology access was provided to facilitate instruction and administrative tasks, an employee's access level depended on their job functions, District employees had no expectation of privacy on District devices or devices connected to the District's system, and the Technology Department must keep information about students and employees confidential.

- Section 3.0 addressed "acceptable use" of technology, stating that online communication must be "responsible, efficient, ethical, and legal[.]" It also warned employees about dangers they may encounter when using electronic resources and the internet. Finally, it required an employee who encountered obscene or pornographic material, or observed inappropriate conduct, to immediately notify a supervisor or site administrator.

- Section 4.0 provided guidelines on how to properly use and care for devices.

- Section 5.0 discussed each user's personal responsibility when using District property. Section 5.2 stated that "[e]mployees shall not access, post, submit, publish, or display harmful or inappropriate matter that is threatening, obscene, disruptive, sexually explicit, or that could be construed as harassment or disparagement of others." The remainder of Section 5.0 prohibited employees from using the District system to "promote unethical practices or any activity prohibited by law, Board policy, or administrative regulations"; prohibited employees from using the system to engage in for-profit activities; and addressed general matters related to internet use.

- Section 6.0 addressed use of unique User ID's and passwords to maintain security.

- Section 7.0 informed employees that violation of the acceptable use policy may result in lost privileges and disciplinary action.

5

- Section 8.0 informed employees that they must annually acknowledge they received, read, and accepted the Employee Use Agreement.

[¶17] Following the hearing, the Hearing Examiner issued his "Recommended Findings of Fact, Conclusions of Law, and Order" to the Board. He recommended the Board reject the superintendent's recommendation to terminate Mr. Earling's employment. More specifically, as to "other good or just cause," the Hearing Examiner recommended the Board find the superintendent failed to prove Mr. Earling violated any Board policy because the policies at issue did not cover the "means by which the images were transferred onto the iPad (inadvertent syncing)[.]" He also recommended the Board find the superintendent failed to meet his burden to prove there was any actual harm or risk of harm to students, staff, or the educational process. Finally, he recommended the Board find the superintendent failed to prove the allegations against Mr. Earling had a sufficient relationship to his fitness or capacity to serve as a teacher.

[¶18] The Board declined to accept the Hearing Examiner's recommendation and ordered Mr. Earling dismissed from his employment for "[a]ny other good or just cause relating to the educational process" under Wyo. Stat. Ann. § 21-7-110(a)(ix).[9] It did not address whether Mr. Earling was subject to dismissal for "immorality" under § 21-7-110(a)(iii).

[¶19] The Board found Mr. Earling violated Board Policy EHAA and Procedure EHAA-R, reasoning as follows:

> The objective of Board Policy EHAA and Procedure EHAA-R when read together is to protect staff and students by prohibiting sexually explicit images on a school-issued device, regardless of the manner in which they were placed on the device. The Board interprets its policy and concludes that Policy EHAA and Procedure EHAA-R prohibit the existence of sexually explicit images on a [District]-owned iPad. The Board does not interpret EHAA-R Section 5.2 to require an intentional or affirmative action by the technology user.

---

[9] The superintendent recommended the Board "terminate" Mr. Earling's employment, but the Board decided the superintendent's notice was "more appropriately deemed to be a recommendation for 'dismissal.'" The Wyoming Teacher Employment Law defines termination and dismissal differently. Wyo. Stat. Ann. §§ 21-7-102(a)(iii) (LexisNexis 2021) ("In the case of a continuing contract teacher, dismissal shall mean cancellation of his contract at any time other than at the end of a school year where proper notice has been given[.]"); 21-7-102(a)(viii) (defining "termination" as "[t]he failure of the board of trustees of a school district in Wyoming to reemploy a teacher at the end of a school year in any given year"). In addition, the notice requirement for termination is slightly different from that for a dismissal in that the teacher must be provided notice "on or before April 15[.]" Wyo. Stat. Ann. § 21-7-106(a) (LexisNexis 2021). It makes no difference to our decision whether Mr. Earling was dismissed or terminated.

Consequently the failure to include the word "sync" (or any other such verb to track the latest trends in technology) in this section is not dispositive to the issue of whether Policy EHAA/Procedure EHAA-R was violated. The Board does not read in a requirement that an individual intentionally place such images on a school-issued device. Deference is afforded the Board's interpretation of its own rules. *See Powder River Basin Resource Council*, ¶ 6, 226 P.3d at 813.

. . . .

In sum, the Board agrees with Superintendent Erickson – pornographic material on any school device violates policy. Accordingly, the Board rejects the Hearing Officer's findings and conclusions in paragraph 52 and 53 of the Recommended Order and finds that Earling was solely responsible for the existence of the sexually explicit images on the [District] iPad in violation of Policy EHAA and Procedure EHAA-R.

[¶20] Next, the Board found Mr. Earling's violation caused harm to the educational process, as the mere presence of the images on the iPad was sufficient to cause harm and there was a risk of harm to two District students—Mr. Earling's daughters. The Board acknowledged there was no evidence to indisputably establish Mr. Earling's daughters saw the images, but found, given their proximity to, and extensive use of the iPad, the risk of harm "was real and definite, not speculative or hypothetical."

[¶21] Finally, the Board found the allegations had a reasonable relationship to Mr. Earling's fitness and capacity to serve as a teacher because his conduct created a risk of harm to students and staff.

Earling violated policy and procedure by the existence of the sexually explicit images on the [District] iPad for which he was responsible. The policy and procedure at issue are specially formulated to prevent sexually explicit images on school-issued devices with the overarching goal to protect students and staff from serious harm. The Board would be remiss and potentially subject to liability to wait until harm had actually occurred to enforce its policies. Thus, the nexus is established by violation of policy and the associated risk of harm, as evaluated by Superintendent Erickson.

[¶22] The district court reversed the Board, concluding that the Board's interpretation of its policies and procedures was contrary to their plain language; its decision was contrary to Mr. Earling's due process rights because the Notice of Termination did not provide him

7

adequate notice that he could be dismissed for the mere existence of sexually explicit images on the iPad; and substantial evidence did not support the Board's decision. The Board timely appealed, arguing the record supports its decision to dismiss Mr. Earling pursuant to Wyo. Stat. Ann. § 21-7-110(a)(ix) in all respects.

## *STANDARD OF REVIEW*

[¶23] We review this case as if it came to us directly from the Board, affording no deference to the district court's decision. *See Mirich v. State ex rel. Bd. of Trs. of Laramie Cty. Sch. Dist. Two*, 2021 WY 32, ¶ 15, 481 P.3d 627, 632 (Wyo. 2021). The Wyoming Administrative Procedure Act governs our review, stating in relevant part:

> (c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:
>
> . . . .
>
> (ii) Hold unlawful and set aside agency action, findings and conclusions found to be:
>
> (A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;
>
> . . . .
>
> (E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

Wyo. Stat. Ann. § 16-3-114(c) (LexisNexis 2021).

## *DISCUSSION*

[¶24] "It is axiomatic that the courts should not undertake to administer the school systems of Wyoming. We should not substitute our judgment in educational matters for those of school boards and administrators." *Mirich*, ¶ 17, 481 P.3d at 633 (quoting *Powell v. Bd. of Trs. of Crook Cty. Sch. Dist. No. 1, Crook Cty.*, 550 P.2d 1112, 1113 (Wyo. 1976)). "[T]he general public—indeed, all of society, has a massive interest in maintaining good schools. 'Good schools' means good teachers—and by 'good teachers' we mean 'good' in all

8

important aspects of their professional lives." *Id.* (quoting *Powell*, 550 P.2d at 1113). "If the teacher does not measure up, according to reasonable standards of professional requirement, the teacher may be removed, but in the process of removal, all the rights and interests of all of those concerned must be considered." *Id.* (quoting *Powell*, 550 P.2d at 1113). The Court, in protecting these rights, must ensure the rules and law are followed. *Id.* (citing *Powell*, 550 P.2d at 1113).

[¶25] Under the Wyoming Teacher Employment Law, Wyo. Stat. Ann. §§ 21-7-101 et seq. (LexisNexis 2021), a superintendent may initiate proceedings against a teacher by providing the teacher written notice of dismissal, suspension, or termination, together with written reasons in support. Wyo. Stat. Ann. §§ 21-7-110(b) (dismissal and suspension), 21-7-106(a) (termination). Those reasons may include any of the following:

> (i) Incompetency;
>
> (ii) Neglect of duty;
>
> (iii) Immorality including, without limitation, engaging in conduct with a student which would be a violation of W.S. 6-2-314 through 6-2-318, 12-6-101(a) or 35-7-1036;
>
> (iv) Insubordination;
>
> (v) Physical incapacity to perform job duties even with reasonable accommodation;
>
> (vi) Failure to perform duties in a satisfactory manner;
>
> (vii) Repealed by Laws 2019, ch. 84, § 2[, eff. July 1, 2019].
>
> (viii) Conviction of a felony; and
>
> (ix) Any other good or just cause relating to the educational process.

Wyo. Stat. Ann. § 21-7-110(a).

[¶26] When a teacher receives written notice, he may request a hearing before an independent hearing examiner provided through the Office of Administrative Hearings. Wyo. Stat. Ann. § 21-7-110(c). At the hearing, the superintendent has the burden to prove the recommendation is based on the reasons provided in the notice. Wyo. Stat. Ann. § 21-7-110(e). The hearing examiner must then submit findings of fact and a recommendation to the Board. Wyo. Stat. Ann. § 21-7-110(g). The Board, in turn, must review the hearing examiner's findings of fact and recommendation and issue a written order to either

terminate, suspend, dismiss, or retain the teacher. *Id.* If the Board terminates, suspends, or dismisses the teacher's employment against a hearing examiner's recommendation to retain them, then its written order must include a conclusion together with reasons supported by the record. *Id.*

[¶27]   As noted above, the superintendent recommended the Board terminate Mr. Earling's employment for "immorality" under § 21-7-110(a)(iii) and "[a]ny other good or just cause relating to the educational process" under (a)(ix).  The Hearing Examiner recommended the Board reject the superintendent's recommendation on both grounds.  Against the Hearing Examiner's recommendation, the Board issued a written order dismissing Mr. Earling's employment for "[a]ny other good or just cause relating to the educational process" under (a)(ix), declining to address immorality under (a)(iii).  Our task then is to determine whether the law and record support the Board's decision to dismiss Mr. Earling under (a)(ix).  *See* Wyo. Stat. Ann. § 16-3-114(c).

### Good or Just Cause Relating to the Educational Process

[¶28]   This case implicates two constraints we have placed on a Board's reliance on the "good or just cause" basis for teacher discipline.  First, the teacher must have been furnished a clear standard of conduct and the Board must rely on the teacher's violation of that clear standard of conduct to justify the discipline.  *Mirich*, ¶ 21, 481 P.3d at 634 (citing *Ririe v. Bd. of Trs. of Sch. Dist. No. One, Crook Cty.*, 674 P.2d 214, 227 (Wyo. 1983)).  "Good or just cause" cannot be established by proving the teacher violated a standard that does not exist.  *Id.* (citing *Bd. of Trs. of Weston Cty. Sch. Dist. No. 1, Weston Cty. v. Holso*, 584 P.2d 1009, 1015 (Wyo. 1978)).

[¶29]   Second, "the facts 'must bear reasonable relationship to the teacher's fitness or capacity to perform his duties in that position.'"  *Id.* ¶ 20, 481 P.3d at 634 (quoting *Powell*, 550 P.2d at 1119).  In other words, the legislature intended that the facts must "bear a relationship to the teacher's ability and fitness to teach and discharge the duties of his or her position."  *Id.* (quoting *Powell*, 550 P.2d at 1119); *see also* 78 C.J.S. *Schools and School Districts* § 401, Westlaw (database updated Nov. 2021) ("Thus, good cause means cause that bears a reasonable relationship to a teacher's unfitness to discharge the assigned duties, or is detrimental to the students." (footnotes omitted)).[10]

### 1. Clear Standard of Conduct

[¶30]   The Board does not explain how it satisfied this requirement.  It cites *Office of State Lands & Investments v. Mule Shoe Ranch, Inc.*, 2011 WY 68, ¶ 11, 252 P.3d 951, 954 (Wyo. 2011) and other cases stating "that we defer to an agency's interpretation of its own rules and regulations unless that interpretation is clearly erroneous or inconsistent with the

---

[10] The "clear standard of conduct" and "reasonable relationship" requirements apply equally to dismissals and terminations.  *See Mirich*, ¶ 21 n.5, 481 P.3d at 634 n.5; *Powell*, 550 P.2d at 1113 n.2, 1118–19.

plain language of the rules" to insist that we must defer to its broad interpretation of the EHAA and EHAA-R to prohibit any existence of inappropriate material on a District device. It then argues for the first time on appeal that, based on its interpretation, Mr. Earling also violated Section 5.2 by "displaying" the photos and images and Section 3.1 by engaging in irresponsible "online communication." Therefore, according to the Board, Mr. Earling was provided a clear standard of conduct. The Board misses the point by relying on deference principles.[11]

[¶31] The relevant question here is not one of deference to the Board's after-the-fact interpretations, it is whether the policies and procedures, on their face, furnished Mr. Earling a clear standard of conduct governing the behavior which resulted in his dismissal. *See Mirich*, ¶¶ 22–25, 481 P.3d at 634–35 (concluding Mr. Mirich was provided clear standards of conduct on professional ethics and conduct, as well as prohibiting teachers from harassing, intimidating, and bullying students; those standards made no exception for situations where the student was also the teacher's child); *Holso*, 584 P.2d at 1014–15 (reversing a termination decision that had been based on the teacher's grading practices— he "historically gave more D and F grades than would appear on a normal probability curve"—because the District had "no formal grading policy, nor was the [teacher] ever told to grade 'on the curve'"); *Ririe*, 674 P.2d at 227 (concluding the teacher had been furnished a clear standard—the position description—on his need to communicate effectively with staff members). We answer that question de novo. *See* Wyo. Stat. Ann. § 16-3-114(c)(ii)(A); *Mirich*, ¶¶ 22–25, 481 P.3d at 634–35; *Ririe*, 674 P.2d at 227.

[¶32] On their face, neither the EHAA nor the EHAA-R, nor both, when read together, furnished Mr. Earling a clear standard of conduct that governed the behavior for which he was dismissed. Neither prohibited teachers from using the same Apple ID on both personal and District devices. And neither informed teachers they could be disciplined if inappropriate material synced from a personal device onto a District device. Most importantly, the District policies and procedures nowhere alerted teachers they could be disciplined for the mere existence of inappropriate material on a District device, regardless of how it got there. Invoking deference principles, the Board read standards of conduct into the EHAA and EHAA-R that did not exist. As a result, Mr. Earling's dismissal is contrary to law. *See* Wyo. Stat. Ann. § 16-3-114(c)(ii)(A); *Mirich*, ¶ 21, 481 P.3d at 634; *Ririe*, 674 P.2d at 227.

## 2. Reasonable Relationship

[¶33] Mr. Earling's dismissal also runs afoul of the reasonable relationship requirement in that the Board's finding that the facts bear a reasonable relationship to Mr. Earling's fitness and capacity to perform his duties as a teacher is contrary to the overwhelming weight of the evidence.

---

[11] Even if deference principles applied, we would not defer to the Board's interpretation of the EHAA and EHAA-R because it is contrary to their plain language. *See Mule Shoe Ranch, Inc.*, ¶ 11, 252 P.3d at 954.

[¶34] We apply the substantial evidence standard of review to the Board's reasonable relationship finding. *See Mirich*, ¶¶ 32–33, 481 P.3d at 637. "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Flauding v. State ex rel. Wyoming Dep't of Transport.*, 2021 WY 131, ¶ 19, 499 P.3d 272, 276 (Wyo. 2021) (quoting *Sweetalla v. State ex rel. Dep't of Workforce Servs., Workers' Comp. Div.*, 2019 WY 91, ¶ 18, 448 P.3d 825, 830 (Wyo. 2019)). A finding of fact is "supported by substantial evidence if, from the evidence preserved in the record, we can discern a rational premise for [it]." *Id.* (quoting *Sweetalla*, ¶ 18, 448 P.3d at 830).

[¶35] We defer to the Board's reasonable relationship finding unless it is "clearly contrary to the overwhelming weight of the evidence in the record." *See id.* ¶ 20, 499 P.3d at 276 (citation omitted). Whether we agree with the outcome of the Board's decision is irrelevant—we review its reasonable relationship finding only to determine if it could reasonably conclude as it did. *See id.* (citation omitted).

[¶36] In concluding that Superintendent Erickson proved the facts bear a reasonable relationship to Mr. Earling's fitness and capacity to serve as a teacher, the Board focused on the risk of harm that his alleged policy violation posed to students and staff. On appeal, the Board again emphasizes that Mr. Earling's irresponsible behavior "created a risk of 'real and definite' harm to students[.]"

[¶37] Our precedent instructs that the Board should consider all circumstances before finding that the facts bear a reasonable relationship to a teacher's fitness or capacity to serve as a teacher. *See Mirich*, ¶¶ 32–33, 481 P.3d at 637 (upholding the Board's dismissal where the Board made findings about how the teacher treated a student and how his conduct affected other students, and the evidence supported those findings); *Holso*, 584 P.2d at 1012, 1015 (concluding an incident was "too trivial and detached from the teacher's ability and fitness to perform his duties" where the teacher discussed rumors about his termination with students during several class periods); *Spurlock v. Bd. of Trs., Carbon Cty. Sch. Dist. No. 1*, 699 P.2d 270, 272–73, 275–76 (Wyo. 1985) (determining the teacher's conduct pertained to his position as a principal, not as a teacher).

[¶38] We have never had occasion to expand on what factors are relevant to such a determination, but recognize that because each case is unique, relevant factors will be varied and not exclusive. Moreover, the relationship between a teacher's conduct and his or her fitness to teach may be more obvious in some cases than others. *See, e.g.*, *Mirich*, ¶¶ 32–33, 481 P.3d at 637.

[¶39] In *Morrison*, the California Supreme Court identified factors that may be relevant to determine whether a teacher's alleged immorality, unprofessional conduct, or conduct involving moral turpitude meant a teacher was "unfit to teach":

12

In determining whether the teacher's conduct thus indicates unfitness to teach the board may consider such matters as the likelihood that the conduct may have adversely affected students or fellow teachers, the degree of such adversity anticipated, the proximity or remoteness in time of the conduct, the type of teaching certificate held by the party involved, the extenuating or aggravating circumstances, if any, surrounding the conduct, the praiseworthiness or blameworthiness of the motives resulting in the conduct, the likelihood of the recurrence of the questioned conduct, and the extent to which disciplinary action may inflict an adverse impact or chilling effect upon the constitutional rights of the teacher involved or other teachers. These factors are relevant to the extent that they assist the board in determining a teacher's fitness to teach, i.e., in determining whether the teacher's future classroom performance and overall impact on his students are likely to meet the board's standards.

*Morrison v. State Bd. of Educ.*, 1 Cal. 3d 214, 229–30, 82 Cal.Rptr. 175, 461 P.2d 375 (1969) (footnotes omitted); *see also Erb v. Iowa State Bd. of Pub. Instruction*, 216 N.W.2d 339, 344 (Iowa 1974) (concluding "[t]hese factors have relevance in deciding whether a teacher is morally fit to teach"), *superseded by statute on other grounds as recognized in Dunphy v. City Council of City of Creston*, 256 N.W.2d 913, 920 (Iowa 1977).

[¶40]  The Colorado Supreme Court applied the *Morrison* factors to cases involving not only an immorality allegation, but also other good or just cause. *Weissman v. Bd. of Ed. of Jefferson Cty. Sch. Dist. No. R-1*,190 Colo. 414, 420–21, 547 P.2d 1267, 1272–73 (1976) (adopting the *Morrison* factors to determine whether a teacher's immoral acts indicated unfitness to teach); *Bd. of Educ. of W. Yuma Sch. Dist. RJ-1 v. Flaming*, 938 P.2d 151, 159–60 (Colo. 1997) (analyzing relevant factors to uphold a teacher's dismissal under Colorado's other good and just cause statute where the teacher repeatedly used "inappropriate physical intervention" when she could not control her frustration with primary age students). The Court also aptly noted that the list of factors is necessarily non-exclusive, as "[h]uman conduct is infinitely various, and it would be folly to attempt to isolate any limited set of criteria as determinative." *Weissman*, 547 P.2d at 1273.

[¶41]  The record shows that the Board failed to consider Mr. Earling's fitness to teach in light of all the circumstances and relevant factors, and had it considered all the evidence and relevant factors it could not have reasonably concluded as it did. *See Flauding*, ¶ 20, 499 P.3d at 276.

[¶42]  For example, the record shows that Mr. Earling taught second graders who were seven or eight years old. While there was no dispute that it would have been harmful if his students had seen the photos and images, there was also no dispute that none of his students

13

saw them. It was also unclear precisely what his daughters, who were students in the District, saw. Superintendent Erickson agreed that he did not know of any harm to students, the possible harm was hypothetical, and he did not know whether Mr. Earling's daughters were harmed because he did not know what they actually saw. Other than the District employees who participated in the superintendent's investigation, no other staff members saw the photos and images.

[¶43] As to the risk that, but for the Department of Family Services' phone call, students and staff may have eventually seen the photos and images, the evidence reflected that it was lower than the Board acknowledged. Mr. Earling kept the iPad at his home during the 2018-2019 school year, it was not on the school network, and he did not use it in the classroom. Mr. Earling testified that he would not have needed to use the iPad in his classroom because he used his laptop to teach and there was plenty of other technology available if his laptop stopped working. He insisted that if he had brought the iPad to school, it would have been to exchange it for an updated device and he would have restored it to factory settings before turning it in. Mr. Crook confirmed that outdated devices were returned to factory settings before they were repurposed or recycled, wiping them of all apps, photos, and data.

[¶44] Further minimizing the risk of harm to students, staff, and the educational process, the allegations had not been disclosed to District personnel or others. Superintendent Erickson testified that the District "ha[d] been extremely careful" not to communicate information about the allegations to students, parents, or staff. Principal Schieffer similarly testified that she had been very careful not to mention the allegations when she communicated with students, parents, and staff about Mr. Earling being on leave. She agreed that "students, parents, [and] staff were given very general, neutral information about why he was gone." She was not aware that anyone within her circle of authority had communicated anything about the allegations.

[¶45] As to the likelihood that the conduct would be repeated, Mr. Earling maintained that it would never happen again, as he had changed his Apple ID, would never again use a personal Apple ID on a District device, and would be vigilant about checking settings on his devices. The superintendent reluctantly agreed that the problem could be avoided if Mr. Earling used a different Apple ID, turned sync settings off, and periodically double-checked them.

[¶46] Though Superintendent Erickson characterized Mr. Earling's conduct as "reckless," the evidence reflected otherwise. As noted above, there was no policy prohibiting a teacher from using the same Apple ID on District and personal devices nor was there a clear policy on syncing. The District provided various technology training and education over the years, and Mr. Earling attended some of those trainings, but the Board recognized that "there was no reliable evidence of the specific content of those trainings or which trainings [he] attended." Mr. Earling was adamant throughout the investigation and proceedings that the photos and images inadvertently synced from his iPhone to the iPad. He insisted that

he had not used the iPad to take the photos, download the images, or edit any of the photos or messages. And he expressed embarrassment and remorse about what happened. Superintendent Erickson expressed his belief that Mr. Earling did not want the photos and images to end up on the iPad.

[¶47] Finally, the superintendent presented no evidence to otherwise connect the allegations to Mr. Earling's fitness or ability as a teacher. To the contrary, the record shows that Mr. Earling had consistently received good evaluations for his teaching performance and been recommended for rehire without conditions each year. He had no prior performance or disciplinary issues. Superintendent Erickson, who had known Mr. Earling for approximately 13 years, agreed that, but for this issue, Mr. Earling was "the kind of person and teacher that [he] would have wanted to continue working in [the] District."

[¶48] Though it is axiomatic that we should not administer Wyoming's school system, we must ensure the rules and law are followed, and the law does not permit us to uphold a factual finding that is contrary to the overwhelming weight of the evidence.

## *CONCLUSION*

[¶49] The Board failed to furnish Mr. Earling a clear standard of conduct, and its finding that the facts bear a reasonable relationship to Mr. Earling's fitness or capacity to perform his duties as a teacher is contrary to the overwhelming weight of the evidence. Consequently, the Board could not dismiss Mr. Earling for "[a]ny other good or just cause relating to the educational process" under Wyo. Stat. Ann. § 21-7-110(a)(ix). We therefore affirm the district court's decision reversing the Board.

15